☐ Original                    ☐

**CLERK'S OFFICE**
**A TRUE COPY**
Nov 06, 2024
S/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| In the Matter of the Search of | ) |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Information about the location of the cellular telephone assigned call number 312-909-6044 ("TARGET CELL PHONE #1"), as further described on Attachment A | ) ) ) ) |

Case No. **24-M-514 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before    11-20-24    *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Stephen C. Dries _____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for   30   days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    11-6-24. 9:35 am

*Judge's signature*

City and state:    Milwaukee, Wi

Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

### Property to Be Searched

1. Records and information associated with the cellular device assigned **312-909-6044** (referred to herein and in Attachment B as "the **Target Cell Phone #1**"), with listed subscriber(s) William ADAMS that is in the custody or control of Cellco Partnership DBA Verizon Wireless (referred to herein and in Attachment B as the "**Service Provider**"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

2. **Target Cell Phone #1**.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the **Service Provider**, including any information that has been deleted but is still available to the **Service Provider** or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the **Service Provider** is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.  The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone #1** for the period of May 1, 2022 to the Present date:

        i.  Names (including subscriber names, usernames, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long-distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions.

        v.  Length of service (including start date) and types of service utilized.

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records**.**

ix.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT").

b.   All stored SMS messages between the account and phone number 262-393-9421.

c.   Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i.   Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii.   Source and destination telephone numbers;

iii.   Date, time, and duration of communication; and

iv.   All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

d.   Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the **Service Provider**, the **Service Provider** is required to disclose the Location Information to the government. In addition, the **Service**

2

**Provider** must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service **Provider**'s services, including by initiating a signal to determine the location of the Target Cell Phone on the **Service Provider**'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the **Service Provider** for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

3

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence and/or instrumentalities of a violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), and (d) involving AV-1 during the period May 1, 2022 to Present date.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the **Service Provider** in order to locate the things particularly described in this Warrant.



CLERK'S OFFICE
A TRUE COPY
Nov 06, 2024
s/ JDH

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
|  | ) **Case No. 24-M-514 (SCD)** |
| Information about the location of the cellular telephone assigned call number 312-909-6044 ("TARGET CELL PHONE #1"), as further described on Attachment A | ) |
|  | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 1591(a)(1) and (b)(1), and 1591(d) | Sex Trafficking by force, fraud, or coercion; and Obstruction or interference with sex trafficking enforcement |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of  30  days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Kathrine L. Sadler*
*Applicant's signature*

Kathrine L. Sadler, Special Agent - FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:  11-6-24

*Stephen C. Dries*
*Judge's signature*

City and state:  Milwaukee, WI

Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Kathrine L Sadler, a Special Agent with the Federal Bureau of Investigation (FBI), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A), for information about the location of two cellular telephones:

a.      the cellular telephone assigned call number **312-909-6044,** (**"TARGET CELL PHONE #1"**), whose service provider is Cellco Partnership DBA Verizon Wireless ("Verizon"), a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921; and

b.      the cellular telephone assigned call number **262-393-9421,** (**"TARGET CELL PHONE #2"**), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

**Target Cell Phone #1** and **Target Cell Phone #2** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. §§ 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each

1

communication to or from the **Target Cell Phone**s.

3.      I am a Special Agent with the Federal Bureau of Investigation and have experience in the investigation, apprehension, and prosecution of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

4.      As a Special Agent for the FBI my primary duty is to investigate human trafficking cases. I have participated in complex sex trafficking investigations that have involved violations of state and federal human trafficking laws, including Title 18, United States Code, Section 1591(a). I have also received training related to the investigation and enforcement of federal sex trafficking laws. As a result of this training and my experience, I am familiar with the technologies and methods traffickers use to recruit, communicate with, control, and exploit their victims. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices. Many of these investigations were aided by procurement of records related to electronic communications and subsequent analysis of those records. In most of those cases, the records provided critical investigative leads and corroborative evidence.

5.      The facts in this affidavit come from my training and experience, my review of documents, and information obtained from other agents, which I have found to be truthful and reliable. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6.      Based on the facts set forth in this affidavit, there is probable cause to

believe that violations of Title 18, United States Code, Section 1591(a)(1) and (b)(1) (sex trafficking by force, fraud, or coercion) and 1591(d) (obstruction or interference with sex trafficking enforcement) have been committed, and continue to be committed, by William Clayton ADAMS. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are victimized in the commission of these offences.

7.     This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41. Specifically, the Court is "a district court of the United States... that has jurisdiction over the offenses being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### I.     Background of the Investigation

8.     The United States is conducting a criminal sex trafficking investigation into William "Bill Bill" Clayton ADAMS (ADAMS). To date, the investigation has revealed that since at least 2009, ADAMS has sent women and girls (referred to as victims from here on) to North Dakota, Nebraska, Minnesota, Florida, Illinois, and elsewhere to dance at strip clubs and perform commercial sex acts for his financial benefit.

9.     ADAMS has met his victims in various ways, including at strip clubs he has been known to frequent. He often recruits his victims under the guise of wanting a romantic relationship with them, and by flaunting luxury goods like custom cars, designer clothing, and gold and diamond jewelry. ADAMS then tells his recruits they can become rich and live a similarly luxurious lifestyle if they will prostitute at his direction.

3

10.    ADAMS sets rules for his victims, including rules about how much money they need to earn and how, when they can eat or sleep, when they can return home, how often and in what manner they need to communicate with him, who else they are allowed to communicate with, and others. When his victims violate these rules, or if ADAMS feels they are disrespectful towards him, ADAMS often puts them "on punishment," including loss of "privileges," higher quotas before they can rest or return home, threats to harm or kill them or their loved ones, and/or physical violence, such as slapping, punching, and beating with objects, such as an extension cord.

11.    Case agents have identified approximately 22 women and girls who have disclosed being trafficked by ADAMS, or whom other victims and witnesses have described being trafficked by ADAMS using force, fraud, and/or coercion.

12.    The victim disclosures made during the course of this investigation have been substantially corroborated by numerous other sources of evidence, including hotel receipts, travel records, Western Union and other financial records, and Facebook and text messages between ADAMS and various victims or recruits.

13.    Other corroborative evidence has included public posts ADAMS has made on social media, including Facebook and Instagram. For instance, On November 2, 2015, DCI Special Agent Jake Jansky viewed ADAMS' Instagram account "Bill.Bill" and noted an image posted approximately one week prior that depicted ADAMS with his palms pressed together with the caption, "Praying to the Pimp God!!!! No more faggot ass bitches!!!!" SA Jansky viewed several other posts on the "Bill Bill" Instagram account that contained the word "Pimp," as well as several depicting expensive jewelry and exotic cars. Another image from the account depicted the words, "Sell more Pu$$y."

4

14.     On that same date, SA Jansky viewed ADAMS' Facebook account "Bill Bill" and noted an image posted by ADAMS that, "Stop liking all my pictures hoe… and choose up!!" I know from my training and experience that "hoe" is a term commonly used to describe a female involved in prostitution, and the term "choose up" refers to a female joining a pimp's "stable" or "family" of victims earning money for the pimp from commercial sex acts.

15.     Case agents have also learned that ADAMS is actively attempting to make sure that no victims or witnesses cooperate with the FBI's investigation—most recently AV-1, discussed below.

**II.     AV-1 and the Target Devices**

    **a.   Disclosure in July 2022 by AV-1.**

16.     One of ADAMS' known victims an adult female whose identity is known to the FBI and who is hereinafter referred to as AV-1. ADAMS recruited AV-1 from a strip club in Franklin, Wisconsin called On the Border (OTB) a few months after she met him there in approximately late 2017.

17.     Between 2020 and 2022, current and former employees at OTB reported to the FBI that ADAMS was involved in sex trafficking and that he had his main girl working at OTB. Additionally, case agents were told that certain dancers were engaging in commercial sex acts at OTB, including AV-1.

18.     On June 1, 2022, FBI National Threat Operations Center (NTOC) received a call from an anonymous individual stating that ADAMS, who also goes by the name of "BILL BILL," was a pimp in Wisconsin and was trafficking girls. The caller stated that ADAMS was pimping three to four girls at that time, and that one of the victims, whom the

caller said was ADAMS' girlfriend. The tipster identified this girlfriend by a variation of AV-1's first name.

19.     These tips caused me to see whether I could find any evidence linking AV-1 to ADAMS. I obtained and reviewed reports from the Village of Glenview Police Department in Illinois of a disclosure AV-1 made on July 13, 2022, regarding ADAMS trafficking her for commercial sex using threats and violence. On that date, AV-1 was a walk-in patient at the Glenbrook Hospital Emergency Room. Medical records listed the reason for AV-1's visit as a physical assault. AV-1 told the Emergency Department at the hospital that her pimp had been beating her. AV-1 informed the Emergency Department that the abuse has been ongoing for five years in many jurisdictions. AV-1 was described as tearful and requesting to speak to law enforcement. Medical records listed a phone number for AV-1 as **312-909-6044**, the phone number associated with **TARGET CELL PHONE #1**.

20.     On July 13, 2022, then-Police Officer Rory Oliver of the Glenview Police Department responded to Glenview Hospital to interview AV-1. When he arrived, he noted that AV-1 was crying and distraught. AV-1 reported to Ofc. Oliver that her "pimp," WILLIAM or "BILL BILL," was forcing her to engage in prostitution. AV-1 told Ofc. Oliver that she worked at a strip club called Club 390 in Chicago Heights and that ADAMS required her to recruit customers and perform commercial sex acts out of that club.

21.     AV-1 stated ADAMS had recently been texting her demanding that she earn him more money and telling her to kill herself. AV-1 said ADAMS had not been violent with her recently, however he had beaten her on other occasions in the past. AV-1 told Ofc. Oliver that she had taken an Uber to the hospital because she was scared and had nowhere

6

to go.

22.     When Ofc. Oliver asked for additional details about ADAMS and the situation, AV-1 told him that she was afraid for her life and no longer wanted a report to be taken or to receive assistance from law enforcement. AV-1 then contacted her sister, who came to pick her up before AV-1 was seen by a doctor.

23.     Later that night, however, AV-1 called 911 to give additional information about ADAMS. She stated ADAMS was a black male and that he lived somewhere in Wisconsin but had been making her prostitute in the Chicago Heights, Illinois area. She indicated she was staying in hotels while working in Illinois. She also stated that ADAMS was planning on moving to Florida and that she believed he would force her to come with him.

24.     AV-1 provided phone number **262-393-9421** for ADAMS, which is the number associated with **TARGET CELL PHONE #2**. Ofc Oliver researched that phone number in CLEAR and found that the subscriber was William ADAMS with a date of birth in 1981. Ofc. Oliver also noted and that while his previous address was in Milwaukee, Wisconsin, his current address was in Wilton Manors, Florida.

25.     At the time of her initial disclosure, AV-1 requested that law enforcement document her disclosures in a report and indicated her willingness to sign a complaint.

26.     On July 14, 2022, AV-1 called the Glenview Police Department to ask for an update on their investigation into the disclosures she had made the day before. AV-1 told officers she feared for her safety because ADAMS had a key to her apartment, on Waterview Drive in Northbrook, Illinois. She said she planned to leave that day; however she was afraid that ADAMS would show up in the meantime.

7

27.     A little later that day, officers tried to make contact with AV-1 in person. When they arrived at her apartment complex in Northbrook, Illinois, they called her from a squad car phone with a blocked number. AV-1 did not believe they were really law enforcement due to the blocked number, and she stated she believed ADAMS was setting her up. Even after some conversation, AV-1 was apprehensive about meeting the officers in person, divulging only that she was in Wisconsin with her family and that she would speak on the phone.

28.     AV-1 asked the officers what action they had taken since speaking with her. The officers asked AV-1 what she wanted to happen, and AV-1 responded that she wanted ADAMS to stop taking her money and beating her up. At the same time, AV-1 said she did not want ADAMS to be arrested. Officers told AV-1 they had called ADAMS and left him a voicemail stating that AV-1 did not want him to take her money and that she did not want to prostitute for him anymore. The report from the Village of Glenview Police Department in Illinois again listed the contact phone number for AV-1 as the number for **TARGET CELL PHONE #1**.

29.     On February 22, 2024, subscriber information and toll records were received for phone number **262-393-9421 (TARGET CELL PHONE #2)**. The subscriber was listed as Donna WILLIAMS with an activation date of January 4, 2014. I know that Donna WILLIAMS is the mother of one of ADAMS' children, born in 2017. AV-1 later disclosed to me that WILLIAMS worked at a bank and assisted AV-1 with setting up her bank account, which ADAMS had access too. Additionally, other victims reported sending money to ADAMS through WILLIAMS, and records from entities like Western Union show WILLIAMS receiving wire transfers from known and suspected sex trafficking

8

victims of ADAMS.

30.     On March 8, 2024, subscriber information and toll records were received for phone number **312-909-6044 (TARGET CELL PHONE #1)**. They confirmed the information in CLEAR that the subscriber was William ADAMS, and they indicated that the account was activated May 1, 2022.

**b. Recent investigation and disclosures.**

31.     On January 31, 2024, I spoke with now-Detective Oliver and asked about his recollection of the disclosures by AV-1 on July 13, 2022. Det. Oliver stated he remembered that AV-1 was branded with a "BILL BILL" tattoo. Det. Oliver also recalled AV-1 being hesitant to proceed with any charges, and he said he could tell that she was afraid. He described AV-1 as crying and said that she seemed to be under the influence of drugs.

32.     Also on January 31, 2024, I spoke to the property manager at Arrive Glenview apartments, located at 2550 Waterview Drive in Northbrook, Illinois. The property manager stated that ADAMS had leased apartment 464 starting August 1, 2021. The primary phone number listed for ADAMS on the lease agreement was the number for **TARGET CELL PHONE #2**. The property manager further stated that ADAMS both gave notice that he intended to vacate and actually moved out of the unit on July 21, 2022, which I noted was six days after AV-1 reported ADAMS to the local police.

33.     On February 28, 2024, I spoke with the leasing manager at American Colony, an apartment complex located at 3215 West Colony Drive in Greenfield, Wisconsin. The property manager stated AV-1 had signed a lease for an apartment on November 20, 2019. On the application, AV-1 listed her employer as "America 1 Trucking." AV-1 said she was employed as a driver and listed her supervisor as William

9

ADAMS. ADAMS' phone number listed as the phone number for **TARGET CELL PHONE #2**.

34.     According to the State of Wisconsin, America 1 Trucking is a Limited Liability Company, and ADAMS is the registered agent. According to the U.S. Department of Labor, America 1 Trucking has not withheld or submitted any payroll taxes for any employee. Additionally, I know in my training and experience that any trucking company that has a U.S. Department of Transportation (USDOT) Number would be listed at the Safety and Fitness Electronic Records (SAFER) System. In general, a USDOT Number is required if a company operates in interstate commerce and has vehicles over 10,000 lbs. A review of records by SAFER Systems did not list any USDOT under the business America 1 Trucking. Open-source searches did not identify any vehicles currently registered to America 1 Trucking or locate a Taxpayer Identification Number (TIN) for the business.

35.     The property manager recalled AV-1 wearing nice clothes and having her hair and make-up done. The property manager also recalled AV-1 being picked up and dropped off in a burnt orange colored SUV.[1]

36.     On February 28, 2024, a Grand Jury subpoena was served on Blackjacks Gentlemen's Club, located at 7N657 Route 25, Elgin, Illinois, for employment records for AV-1. The general manager provided application records for AV-1 that listed her primary phone number as that of **TARGET CELL PHONE #1**. Additionally, AV-1 listed the phone number of **TARGET CELL PHONE #2** as her emergency contact (with no name).

37.     On February 28, 2024, a Grand Jury subpoena was served on Club 390,

---

[1] It should be noted that at various points in time, ADAMS has owned multiple vehicles at a time with matching custom paint jobs, rims, and interiors. Between roughly 2008 and 2012, victims and witnesses recalled ADAMS driving several custom dark orange vehicles, including an orange Dodge Challenger, an orange Aston Martin, an orange conversion van, an orange Lexus sports coupe, and an orange Dodge Ram pickup truck.

located at 390 E. Joe Orr Road, Chicago, Illinois, for employment records for AV-1. The club bookkeeper provided employee records for AV-1 that listed her emergency contact as "Bill" with the phone number of **TARGET CELL PHONE #2**.

38. On May 24, 2024, I met with AV-1 at the Super 8 hotel located at 17225 Halsted Street in South Holland, Illinois. AV-1 estimated that she had first met ADAMS thirteen years ago through a mutual friend while she was working at OTB in Franklin, Wisconsin. AV-1 claimed at that time that she had not been working for ADAMS for a few years, however she said she still talked to him daily and was fearful of cutting ties with him.

39. AV-1 said ADAMS knew the FBI had an open human trafficking investigation into him he was going to prison. AV-1 also stated she had heard that another one of ADAMS "girls" tried to extort money from ADAMS. After law enforcement approached the unnamed female, asking her questions about ADAMS' involvement in human trafficking, the female reportedly told ADAMS she would talk to law enforcement unless ADAMS paid her. During the interview, AV-1 confirmed that her telephone number was that of **TARGET CELL PHONE #1**.

40. In early to mid-June 2024, case agents received several telephone calls and text messages from AV-1 from phone number **312-909-6044 (TARGET CELL PHONE #1)**. In these calls and messages, AV-1 disclosed that ADAMS continues to be mentally and physically abusive toward her. In several of her communications, she also indicated that she could not or should not speak to the case agents because ADAMS either knew or was going to find out that she was talking. She also indicated at that ADAMS had directed her to cease contact with the case agents and/or block the case agents' phone numbers.

41. AV-1 stated she had been with ADAMS for the last seven years and

11

described them as "seven years of hell." AV-1 admitted to case agents that she had told ADAMS that she was talking to the FBI. ADAMS told her that his lawyer had told him, "Your girl shouldn't be talking to them," meaning the case agents.

42.     AV-1 stated ADAMS has two phones, with one of the phone numbers being **262-393-9421 (TARGET CELL PHONE #2)**. AV-1 said ADAMS uses an application called Signal to communicate rather than native text messaging. I know that Signal uses end-to-end encryption, making it more difficult for law enforcement to recover text messages exchanged on this platform. AV-1 explained that when ADAMS does use native text messaging on his cell phone, he frequently deletes his messages.

43.     On June 13, 2024, case agents spoke with AV-1's sister, A.M. A.M. said she had not heard from AV-1 for two years; however, AV-1 had reached out about a week earlier in distress. A.M. forwarded case agents a photo of AV-1 via text message. The photo was dated June 8, 2024, and showed AV-1' face with significant swelling, as well as bruises and cuts, and a tattoo over her left eyebrow reading "Bill Bill" in cursive script. A.M. said she had known AV-1 to be in an on and off relationship with ADAMS for a long time. A.M. said ADAMS kept AV-1 away from her family. Additionally, A.M. stated her, and her family are afraid of ADAMS and would be concerned for their safety if AV-1 came to visit and ADAMS knew where they lived.

44.     On June 14, 2024, A.M. called case agents to report that she had received a text message from AV-1 saying ADAMS had threatened to kill her the night before. A.M. was concerned because she had been unable to get in touch with A.M. since receiving that message.

45.     Case agents were able to contact AV-1 on **TARGET CELL PHONE #1**

and asked AV-1 about the photo she had sent A.M. of her face with injuries. AV-1 stated

that photo depicted injuries she had sustained from ADAMS two years ago, during the

COVID-19 pandemic. AV-1 explained that the day of this incident, she was worked a day

shift at a strip club and accidentally put her phone on airplane mode when she tried to turn

off Wi-Fi. AV-1 went to bed after her shift and was later awoken by ADAMS beating her.

AV-1 stated ADAMS beat her because he was not able to track her via the "find my

iPhone" locator function due to her phone being in airplane mode. AV-1 stated ADAMS

broke her ribs and that she had pain while breathing, but she did not go to the hospital or

tell anyone that ADAMS had beaten her.

46.     AV-1 reiterated that ADAMS would check her location all day every day,

and she was not allowed to go anywhere or do anything without his permission. AV-1 also

stated she was depressed and suicidal because of the situation with ADAMS. Because she

was depressed, ADAMS told her nearly every other day, "Go drink some bleach; you'll die

faster."

47.     On June 15, 2024, case agents received a call from AV-1, who was using

**TARGET CELL PHONE #1**. AV-1 stated that she had a call with ADAMS on June 14,

2024, and that during this call, one of AV-1's friends was on the line without ADAMS'

knowledge. During the phone call, ADAMS threatened AV-1 and told her, "Just know, I'm

going to kill you." AV-1 also heard ADAMS call her a "police ass bitch" to his cousin.

48.     On June 18, 2024, case agents spoke by phone with AV-1's friend, M.L.

M.L. indicated that she had never met ADAMS but that she knew him to be AV-1's

boyfriend of the last seven years. AV-1 had told M.L. that ADAMS lived in Florida and

worked in real estate. M.L. recalled a three-way phone call the previous week between AV-1 and ADAMS that M.L. had listened in on with AV-1's permission, but without ADAMS' knowledge. During this call, ADAMS told AV-1 that he knew she was working with "the Feds." M.L. said ADAMS was telling AV-1, "You're gonna die. You're gonna die." M.L. said that in spite of this, when M.L. talked with AV-1 about the call later, AV-1 tried to claim ADAMS had not threatened her. M.L. indicated that on another prior occasion, she had heard ADAMS yell at AV-1 on the phone, and AV-1 had later denied that ADAMS yelled at her.

49.     On August 8, 2024, case agents received a phone call from AV-1 from **TARGET CELL PHONE #1**. She stated that ADAMS had gotten upset with her on her birthday, beaten her, taken her money, and left. AV-1 stated ADAMS got upset because she had spent money she earned getting her hair done, and she was not making him as much money as he wanted. AV-1 tried to tell ADAMS that the money was hers, however he insisted that it was his. Before ADAMS left, he told her that she had to go talk with one of his other "hoes." ADAMS also tried to go through her phone and asked AV-1 whether she had talked to the FBI. AV-1 stated she is scared because of who ADAMS is that he will hurt her.

50.     During that conversation, AV-1 told case agents that ADAMS wants to impregnate her to carry on his legacy, but AV-1 does not want to have a child with him. When asked whether ADAMS had forced himself on her sexually, AV-1 replied, "No comment." AV-1 stated ADAMS had access to her place and would just show up whenever he wanted to see her. Case agents urged AV-1 to go to the hospital or call the police if ADAMS hurt her in any way, however AV-1 was hesitant to the idea. AV-1 stated

14

ADAMS would track her through her phone and always knew her location. She explained that if she did not share her location, ADAMS would beat her.

51.     AV-1 stated she has to let ADAMS know when she buys something otherwise, he will get upset. ADAMS has control over her money and has access to her bank account. AV-1 expressed that she would like to meet with case agents in person, but she asked, "How could I when he knows my location?"

52.     On August 16, 2024, case agents spoke with AV-1 over the phone via **TARGET CELL PHONE #1**, and she explained how she had performed commercial sex acts for ADAMS, starting in the Eastern District of Wisconsin and then moving elsewhere.

53.     AV-1 stated she used to dance at OTB in 2017.[2] AV-1 stated she was introduced to ADAMS through a friend that also worked at OTB. AV-1 stated her friend was recruited by ADAMS at Solid Gold strip club in Milwaukee, Wisconsin and had worked for ADAMS for approximately two years when she met ADAMS. AV-1 estimated it took approximately six months between she first met ADAMS until she started working for him. She would meet men there and get their phone numbers. When she was done working there, ADAMS would take her phone and start texting the men pretending to be her. ADAMS would set up sex dates with the men, set the prices, drive AV-1 to the location of the sex dates, and wait for AV-1 to be done. Once done, AV-1 would get paid in cash, but ADAMS would take all the money.

54.     AV-1 stated she does the same work for ADAMS now. AV-1 stated ADAMS has a quota for her to make him at least $1,000 per day doing commercial sex dates. AV-1 stated ADAMS doesn't used online advertisements anymore, but he has his

_____

[2] According to Wisconsin Department of Correction, ADAMS was released on extended supervision on November 28, 2017.

15

girls work out of strip clubs because he believes it reduces his risk of being charged with a crime. AV-1 stated ADAMS will check on her every day and either takes the money she earns from her bank account or takes cash from her.

55.     AV-1 stated ADAMS will beat her up and tell her that she is too broke for him. ADAMS used to come over to AV-1' place every day to pick up money, but now he does not come that often because she does not make that much money. AV-1 stated she used to make ADAMS around $10,000 per week and estimated she has made him well over one million dollars.

56.     AV-1 stated she is scared and believes ADAMS will kill her for talking to the FBI. AV-1 stated she lives in Florida but would not provide case agent with a city or her address.

57.     On August 18, 2024, case agents received a text message from AV-1 using **TARGET CELL PHONE #1** stating, "He had me block your number, but you can call me when it's convenient for you." Case agents attempted to call AV-1 back, however the phone went straight to voicemail.

58.     On September 12, 2024, case agents received a call from AV-1 from **TARGET CELL PHONE #1**. AV-1 stated ADAMS took her phone and AV-1 was unable to contact case agents. AV-1 stated ADAMS had been threating her every day for the past three days stating that he would kick her out so she becomes homeless and take the car away from her since she isn't making him enough money. AV-1 stated ADAMS is verbally abusive toward her every day and will tell her he hopes she dies.

59.     On September 17, 2024, case agents spoke with AV-1 via **TARGET CELL PHONE #1**. AV-1 stated ADAMS came into OTB after he got out of prison. AV-1 stated

ADAMS first had AV-1 do commercial sex dates out of Hawthorn Extended Stay by Wyndham Oak Creek located at 1001 W. College Ave, Oak Creek Wisconsin. ADAMS had AV-1 work from 11AM until 2AM every day. AV-1 stated ADAMS had other "girls" work for him at OTB as well as AV-1. ADAMS told AV-1 that she was not allowed to talk to anyone regarding doing commercial sex dates.

60.     Since mid-September 2024, case agents have offered victim services to AV-1. On September 13, 2024, case agents provided a contact phone number for an emergency shelter in Florida. They also offered to explore the possibility of bringing AV-1 up to Wisconsin and temporarily housing her in a hotel. AV-1 did not accept these offers, however, and indicated it would be unsafe for her to leave ADAMS due to the risk of retaliation.

61.     Since October 10, 2024, case agents have tried to contact AV-1 by calling her approximately six times and texting her approximately three times, however AV-1 has not answered. Case agents have noted that when they have tried to call AV-1 at **TARGET CELL PHONE #1**, the phone goes straight to voicemail, possibly indicating that the case agents' numbers have been blocked.

62.     Based on these facts, there is probable cause to believe that ADAMS has trafficked, and continues to traffic, AV-1 for commercial sex by means of force and coercion, and he continues to interfere in her ability to meet with case agents and provide additional evidence concerning ADAMS' crimes.

63.     There is also probable cause to believe that identifying AV-1 and ADAMS' whereabouts, standing alone and in relationship to one another, will provide evidence helpful to the investigation of these crimes. During the investigation, AV-1 has disclosed

multiple times that ADAMS assaults her physically and takes her cash. She has also indicated that ADAMS sometimes sends her out of state to earn him money, or that he travels out of state (for example, to the Chicago area) without her. Obtaining location information for AV-1 and ADAMS will help corroborate AV-1's statements and will help case agents identify opportunities to meet with AV-1 while she is away from ADAMS in order to ask her additional questions about ADAMS' crimes and learn of other sources of corroborative evidence.

64.     Additionally, the warrant I am seeking for **TARGET CELL PHONE #1** would include the contents of stored SMS communications between ADAMS **(TARGET CELL PHONE #2)** and AV-1 **(TARGE CELL PHONE #1)**.[3] There is probable cause to believe that evidence of threats or demands made by ADAMS to AV-1, including ADAMS' instructions to AV-1 not to speak to the case agents, will be found in any text communications between them.

## TECHNICAL BACKGROUND

65.     In my training and experience, I have learned that Verizon and T-Mobile (hereinafter, "the **Service Providers**") provide cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data, cell-site data, also known as "tower/face information" or "cell tower/sector records," and timing advance or engineering data commonly referred to as per call measurement data (RTT, True Call, LDBoR, or

---

[3] This information is being sought from the warrant for **TARGET CELL PHONE #1** because it is retained by Verizon Wireless.

equivalent). E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half- mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

### I. Cell-Site Data

66.     Based on my training and experience, I know that the **Service Providers** can collect cell-site data on a prospective basis about the **Target Cell Phones**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the **Service Providers** typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

67.     Based on my training and experience, I know that **Verizon** can also collect

per-call measurement data, which also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

## II.     **E-911 Phase II / GPS Location Data**

68.    I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the **Service Providers** can collect E-911 Phase II data about the location of the **Target Cell Phones**, including by initiating a signal to determine the location of the **Target Cell Phones** on the **Service Provider's** network or with such other reference points as may be reasonably available.

20

### III. Pen-Trap Data

69.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

### IV. Subscriber and Messaging Information

70.     Based on my training and experience, I know that wireless providers such as the **Service Providers** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the **Service Providers** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the

21

information can be used to identify the **Target Cell Phones'** user or users and may assist in the identification of co-conspirators and/or victims. I further request extended subscriber information, handset identifiers, handset make and model, Wi-Fi MAC address, and account notes and memos for the target device.

71.     I also know, based on my training and experience, that **Verizon**, the **Service Provider** for **TARGET CELL PHONE #1** retains the content of SMS messages for a period of 7 days.

## AUTHORIZATION REQUEST

72.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

73.     Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) & (4), this application and the accompanying warrant are intended to comply with requirements set forth in 18 U.S.C. §§ 3122-3123.

74.     I further request the following information from the service provider: the installation and use of a pen register trap and trace device, all real-time precision location information, including E-911 Phase II data, GPS data, and latitude-longitude data, real time cell site information, and per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent) beginning 30 days from the date the warrant is issued.

75.     I further request call detail records and data reports (voice, SMS, MMS), including cell site location information, originating and destination IP addresses, per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent) for the past 30 days.

76.     I further request the content of all stored SMS messages between **Target Cell Phone #1 and Target Cell Phone #2.**

77.     I further request that the Court direct the **Service Providers** to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

78.     I also request that the Court direct the **Service Providers** to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the **Service Providers'** services, including by initiating a signal to determine the location of the Target Cell Phone on the **Service Providers'** network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the **Service Providers** for reasonable expenses incurred in furnishing such facilities or assistance.

79.     I further request that the pen register / trap and trace device be transferable to any changed dialed number subsequently assigned to a device bearing the same ESN, IMSI, or SIM as the Target Cellular Device; any changed ESN, IMSI, or SIM subsequently assigned the same dialed number as the Target Cellular Device; or any additional changed dialed number, ESN, IMSI, or SIM listed to the same subscriber account as the Target Cellular Device.

80.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the

**Target Cell Phones** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

81.     Because the warrant will be served on the **Service Providers**, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phones** outside of daytime hours.

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned **312-909-6044** (referred to herein and in Attachment B as "the **Target Cell Phone #1**"), with listed subscriber(s) William ADAMS that is in the custody or control of Cellco Partnership DBA Verizon Wireless (referred to herein and in Attachment B as the "**Service Provider**"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

2. **Target Cell Phone #1**.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the **Service Provider**, including any information that has been deleted but is still available to the **Service Provider** or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the **Service Provider** is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone #1** for the period of May 1, 2022 to the Present date:

   i. Names (including subscriber names, usernames, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions.

   v. Length of service (including start date) and types of service utilized.

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records**.**

ix.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT").

b.  All stored SMS messages between the account and phone number 262-393-9421.

c.  Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i.  Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii.  Source and destination telephone numbers;

iii.  Date, time, and duration of communication; and

iv.  All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

d.  Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the **Service Provider**, the **Service Provider** is required to disclose the Location Information to the government. In addition, the **Service**

2

**Provider** must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service **Provider**'s services, including by initiating a signal to determine the location of the Target Cell Phone on the **Service Provider**'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the **Service Provider** for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

3

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence and/or instrumentalities of a violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), and (d) involving AV-1 during the period May 1, 2022 to Present date.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the **Service Provider** in order to locate the things particularly described in this Warrant.

4